11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

Marco Antonio Gonzalez

Appellant

Vs.                   Nos.
11-01-00164-CR and 11-01-00165-CR  --
Appeals from Dallas County

State of Texas

Appellee

 

The jury
convicted Marco Antonio Gonzalez of the aggravated assault of Ricky Poole,[1]
and it also convicted him of the aggravated assault of Leo Bondurant.[2]  After a presentence investigation, the trial
court sentenced appellant to confinement for 2 concurrent 12 year terms.  We affirm.

                                                                   Points
of Error

Appellant
presents three points of error.  First,
he argues that the evidence is Afactually insufficient@ to support the convictions because he was Amisidentified as the shooter.@ 
Next, he argues that, even if it was proved that he was the shooter, he
was guilty at most of the lesser offense of deadly conduct.  Finally, he argues that the trial court erred
in admitting Aback door@ hearsay that he had a prior violent altercation with the police.

                                              Standard
of Review on Factual Sufficiency








The jury
is authorized to weigh the credibility of the witnesses, and the jury may
accept or reject all or any part of the testimony as to disputed facts.  See TEX. CODE CRIM. PRO. ANN. arts. 36.13
& 38.04 (Vernon 1979 & 1981); 
Beardsley v. State, 738 S.W.2d 681, 684 (Tex.Cr.App.1987); Bowden v.
State, 628 S.W.2d 782, 784 (Tex.Cr.App.1982); Miller v. State, 566 S.W.2d 614,
618 (Tex.Cr.App.1978).  The evidence is Afactually insufficient@ to support a conviction if the reviewing
court, after considering all of the evidence in a Aneutral light,@ concludes either that Athe evidence is factually insufficient to support a finding of a vital
fact@ or that Athe finding of a vital fact is so contrary to the great weight and
preponderance of the evidence as to be clearly wrong.@[3] 
Goodman v. State, ___ S.W.3d ___ (No. 0120-00, Tex.Cr.App., November 21,
2001)(not yet reported); see also Johnson v. State, 23 S.W.3d 1, 7-9 (Tex.Cr.App.2000);
Medina v. State, 7 S.W.3d 633, 637 (Tex.Cr.App.1999), cert. den=d, 529 U.S. 1102 (2000); Clewis v. State, 922 S.W.2d 126, 129-35
(Tex.Cr.App.1996).  

                                                           Evidence
Before the Jury

Seven
witnesses testified before the State rested. 
The first one was a disinterested eyewitness, and the next three were
Code Enforcement Employees of the City of Dallas.  The last three witnesses were two Dallas police officers and an
employee of the Southwest Institute of Forensic Sciences.  

Appellant=s trial counsel developed his trial theory
of  Amisidentification@ by testimony from appellant=s neighbor and her daughter, by testimony from appellant=s girlfriend, and by testimony  from appellant=s parents.  Appellant=s lawyer also questioned two Dallas police
officers and an expert witness in connection with his theory of
misidentification.  Appellant did not
testify.  

1.  Everardo Cavazos testified  that he was Aputting down cement@ when he heard two or three gunshots and saw somebody  with a gun. 
He used the State=s diagram to show where he was standing and where the man with the gun
was standing.  Cavazos said that
appellant Aseems a little heavier today@ and that he was Anot too sure@ of his identification of appellant as the man he saw with the gun on
the day of the shooting.  Cavazos said
that he did not hear any of the conversation between the man with the gun and
the three men who worked for the city. 
He estimated that he was about 80 feet away from them.








2.  Ricky Poole, one of the two complainants,
testified that he was the crew chief for the Code Enforcement Employees who
went out to mow the weeds and clean the vacant lot which was not in compliance
with the city code.  The crew took Abefore and after pictures@ to document the work which they do.  There were three men in a pickup and one man
driving a tractor.  The man on the
tractor mowed the property and left before the incident.  The other three city employees were still at
the scene when the incident occurred. 
They used weed eaters, and they cleaned the vacant lot and bagged the
trash.  While Poole was filling out
paperwork, one of his workers came over and told him that there was Aa guy over there with a gun.@ 
Poole then used the State=s diagram to show where he and his crew were and where the guy with the
gun was standing.  Poole identified
appellant as the man who had the gun in his hand that day.  Poole said that he told appellant who they
were and what they were doing.  Relevant
portions of Poole=s
testimony on direct examination are shown:

Q: What
did he say?

 

A: He
said, AI don=t want you taking no [g - d d - - n] 
pictures of my house.@

 

Q: Okay.

 

A: And my
response to that was we=re taking pictures of the lot, we=re here to clean up, you know, that=s what the citizen called about, a violation.  So we come to comply it.

 

Q: Did you
tell him that?

 

A: Yes, I
did.

 

Q:
Okay.  Did he say anything else to you?

 

A: He said
something AI don=t want you taking no picture in this neighborhood period.@

 

Q:
Okay.  What did you do then?

 

A: When I
said - - when he said that he fired.

 

Q:
Okay.  When you say he fired, what do
you mean?

 

A: He
raised his pistol up and he shot three times directly at me.

 

                                                           *    *   
*

 

Q: Now,
your two other co-workers, were they basically back behind you at this point?

 

A: Leo
was still on the lot and Raymond was hid already.  (Emphasis added)

 








Poole also testified that
no one in the neighborhood would let them use a telephone, that they went to
the police station to report the incident, and that the police had them go back
to the scene.  Poole said that he was
there when the police brought appellant out of the house, that appellant had
changed clothes, but that there was no doubt in his mind that the man the
police brought out of the house was the same man who had fired the shots at
him.  Poole said that appellant=s haircut and face were Astill the same.@  Poole said that there was Ano doubt@ in his mind that the man he identified in court was the man who shot
the gun that day.

3.  Raymond Bailey testified that he mowed grass
for the City of Dallas and that he worked with Poole.  Bailey testified that on October 18, 1999, they were doing their
job when Aa fella came out [and] started shooting at
us.@  The
tractor driver had finished.  There were
just three of them, and they were cleaning up after the tractor.  Bailey used the State=s diagram to show where he was when he saw
the man with the gun.  Bailey went to
the truck to tell Poole about the man with the gun.  Bailey then identified appellant as the man he saw that day with
the gun in his hand.  Bailey said that
Poole went to tell the man who they were and that, a minute or two later,
Bailey heard the shots being fired. 
Bailey said that he heard two or three shots, that he did not want any
part of it, and that he started running down the street to get away from that
area.  Bailey was also there when the
police brought appellant out of his house, and Bailey said that appellant had
changed clothes after the shooting and before the police arrested him.  Bailey said that there was Ano doubt@ in his mind that appellant was the man he saw with the gun on the day
of the shooting.








4.  Leo Bondurant, the complainant in one of the
indictments, testified that he worked with Code Enforcement for the City of
Dallas.  Bondurant testified that he was
working with Poole and Bailey on October 18, 1999, and he also used the State=s diagram to show where he was when the shots
were fired.  Bondurant testified that,
when Bailey said that Athe
guy had a gun,@ Bondurant looked up and saw appellant who Awas hollering >I don=t want you here by my house taking
pictures.=@ 
(Emphasis added)  Bondurant also
identified appellant as the man who was shooting at them.  Bondurant testified that appellant was a Alittle bit heavier now@ than he was at the time of the
shooting.  Bondurant testified that he
was standing behind Poole when the shots were fired.  Bondurant was working part-time, and he left before the police
got appellant out of the house. 
Bondurant agreed on cross-examination that he did not feel threatened
and that he Ajust stood there, like, dumbfounded.@ 
Bondurant also testified that he did not think that appellant Afired directly at anybody.@  

5.  Brian Coody testified that he was a patrol
officer for the Dallas Police Department. 
He responded to the report of a shooting in the 4500 block of Marcell
Street on October 18, 1999.  He spoke
with the three Code Enforcement workers who had reported the shooting.  After his Acover@ arrived, they went up and knocked on the
door.  They could hear somebody inside
the house, but no one answered the door. 
They called for a supervisor; later, two tactical squads were called to
the scene.  They negotiated with
appellant for about one and a half or two hours, trying to get him to
surrender.  Appellant finally came out
through the front door, and the tactical squad Atook him down in the front yard.@  

6.  Detective Daniel F. Krieter of the Dallas
Police Department testified that he was assigned to the crime scene response
section.  He did a Aballistic handwashing@ on appellant on October 18, 1999, and sent
the evidence kit to the Southwest Institute of Forensic Sciences.  

7.  Vicki Hall testified that she was employed
as a trace evidence analyst at the Southwest Institute of Forensic
Sciences.  She testified about the tests
on the evidence from the kit for the Aballistic handwashing@ which was done on appellant on October 18, 1999.  That evidence showed  Aelevated levels of antimony, barium and lead consistent with gunshot
residue@ on the back and palm of appellant=s right hand.  Hall testified that this was consistent with appellant having
fired a gun with his right hand while his left hand was in the proximity of the
gun.  On cross-examination, she agreed
that there were other theoretical sources of the trace elements which were
found on appellant=s
hands.  On redirect examination, she
said that the elements which were found on appellant=s hands were Amore characteristic of gunshot residue@ than an environmental source for a mechanic or gardener.  








After the
State rested, appellant=s lawyer recalled Officer Coody, and he agreed to find out the name of
the police officer who actually put the cuffs on appellant at the time of his
arrest.  At the very end of the
testimony, appellant=s
lawyer called Officer James David Byas. 
This officer testified that he was on the Aarrest team@ of
the tactical unit which arrested appellant on October 18, 1999.  Officer Byas testified that he did not
recall appellant telling him at the time of the arrest that Ahe had not committed the crime.@

Relevant
testimony of the other six witnesses called by appellant=s lawyer can be summarized as shown:

1.  Nestora Gonzalez testified that appellant
lived one house from where she lived. 
She and her daughter were outside in their yard when the incident
happened on October 18.  She testified
that they heard some shots and saw somebody running by.  She said that the person was wearing Aa white shirt and khaki pants@ and that he ran by real fast about two
minutes after they heard the gunshots. 
She said that the man who was running was Athinner@ than appellant.       

2.  Daisy Gonzalez testified that she and her
mom were outside their house on October 18, 1999, when they heard two or three
shots and then saw a guy running fast through the alley.  She said that the guy was wearing Aa white shirt and khaki pants@ and that he was Athinner@ than appellant.  She said that,
when appellant was arrested, he was wearing a different shirt.  He was wearing a Awhite shirt with some figures on it, gray and
blue and yellow.@  She
also testified that, when she saw him earlier that morning before the gunshots,
he was wearing the shirt which he was wearing at the time of his arrest.  

3.  Sally Nanthathongthip testified that she was
Adating@ appellant.  At the time of his
arrest, appellant was wearing the same clothes that he wore when she was with
him on the night before the arrest.








4.  Araceli Gonzalez testified that she was
appellant=s mother and that she saw him that morning
before she left for work.  She said that
he was wearing the same clothes then that he was wearing at the time of his
arrest.  She was not home at the time of
the shooting, but she was there when her son came out of the house and was
arrested.  She said that one of her son=s friends was named Juggie and that he was
thinner than her son.  On
cross-examination, she said that the police officers were trying to persuade
her son to come out of the house and that this went on for 30 minutes or an
hour or maybe longer. On redirect examination, she said that her son had called
her when the police came to the house and that he had told her that Juggie had
fired some shots at some people and that her son was afraid.  She said that she told him to Astay there at the house and wait until his
dad got home.@  

5.  Pablo Gonzalez testified that he was
appellant=s father and that a neighbor called him about
the event at his house involving his son. 
The father said that he went home from work and that there were Amany@ police officers there.  They
would not let him go to his house.  He
gave the officers the key to his house. 
He said that his son had been welding on the fence and working on a car
(motor, transmission, and battery) on the day before the incident.  

6.  Patrick Edward Besant-Matthews, M.D.,
testified as an expert witness for appellant. 
He gave theoretical ways that the trace elements could have gotten on
appellant=s hands from welding and from working on the
car.    

The first
two points of error are overruled.  The
evidence is Afactually sufficient@ to support the convictions for aggravated
assault of both complainants.  The jury
could find from the evidence that appellant was not Amisidentified as the shooter@ and that he was guilty of two aggravated
assaults and not merely for the lesser offense of deadly conduct.  Goodman v. State, supra; Johnson v. State,
supra; Medina v. State, supra; Clewis v. State, supra.      

                                                            Prior Violent Altercation

Appellant
argues in his final point of error that the trial court erred in admitting into
evidence Aback door@ hearsay that revealed to the jury that Aappellant had a prior violent altercation with the police.@ 
Appellant refers in his brief to a portion of the testimony of
Complainant Poole involving this question by the district attorney, appellant=s objection, and the trial court=s ruling:

Q: Well,
so did they - - based on the information that you obtained while you were
there, what was your impression as to whether or not Cockrell Hill [police
officers] knew what they were in for at that house?

 

[DEFENSE
COUNSEL]: Objection, Your Honor, calls for hearsay again.

 

THE COURT:
Overruled.

 








After that ruling,
Complainant Poole testified that he Awas aware@ that
the Cockrell Hill police officers Aknew what they were in for at this particular house@ and that this was Apart of the reason@ they called in the Tactical Unit from the
Dallas Police Department.  This
testimony does not show that appellant had had a prior violent altercation with
the police.  The third point of error is
overruled.

                                                                This
Court=s Ruling

The
judgments of the trial court are affirmed.

 

BOB
DICKENSON

SENIOR
JUSTICE

 

January 10, 2002  

Do not publish.  See TEX.R.APP.P. 47.3(b).  

Panel consists of:  Arnot, C.J., and

Wright, J., and Dickenson, S.J.[4]











[1]Cause No. F99-53757-JH in Criminal District Court No. 1
of  Dallas County and Cause No.
11-01-00164-CR in this court.





[2]Cause No. F99-53758-JH in Criminal District Court No. 1
of Dallas County and Cause No. 11-01-00165-CR in this court.





[3]This would require a remand for a new trial, but it
would not result in a judgment of acquittal.





[4]Bob Dickenson, Retired Justice, Court of Appeals, 11th
District of Texas at Eastland sitting by assignment.